UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NIARA BURTON a/k/a          :          **1:19-CV-01574**
HERMAN BURTON,              :
                            :
         Plaintiff,         :
                            :
     v.                     :          (Magistrate Judge Schwab)
                            :
SECRETARY JOHN WETZEL, *et al.*,  :
                            :
         Defendants.        :
                            :

## <u>MEMORANDUM OPINION</u>

## I.  Introduction.

The plaintiff, a transgender prisoner, contends that the defendants violated her constitutional rights by retaliating against her for complaining about purported sexual harassment, by denying her due process in connection disciplinary proceedings that followed the allegedly retaliatory misconduct reports that she received, and by implementing policies that caused the alleged retaliation and failing to correct the allegedly ongoing pattern of retaliation.  Currently pending is a motion to dismiss the plaintiff's amended complaint filed by five of the eight defendants.  For the reasons that follow, we will deny that motion.  We will, however, sua sponte dismiss some of the claims.

## II.  Background and Procedural History.

On September 11, 2019, the plaintiff, Niara a/k/a Herman Burton, began this action by filing a complaint.  The parties subsequently consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned.  After we granted the defendants' motion for a more definite statement, Burton filed an amended complaint on August 12, 2020.

At the time Burton filed the complaint and amended complaint, she was an inmate at the State Correctional Institution at Muncy ("SCI Muncy"), and her claims concern events and conditions at SCI Muncy.  Burton has since been transferred from SCI Muncy; she is currently incarcerated at the State Correctional Institution Houtzdale.

The amended complaint names eight defendants: (1) John Wetzel, the Secretary of the Pennsylvania Department of Corrections; (2) David Radziewicz, the Department of Corrections' state-wide compliance manager of the Prison Rape Elimination Act ("PREA"); (3) Wendy Nicholas, the Superintendent of SCI Muncy; (4) William Frantz, a deputy for facilities management at SCI Muncy; (5) Angel Baez-Sprague, PREA Compliance Manager at SCI Muncy; (6) Lt. Sipe, a lieutenant and PREA investigator at SCI Muncy; (7) K.L. Brelsford, a corrections officer at SCI Muncy; and (8) Dawn Santana, a hearing examiner at SCI Muncy. Burton brings her claims against defendant Wetzel in his official capacity only, and

2

she brings her claims against the other defendants in both their individual and
official capacities.[1]

Burton's amended complaint is difficult to follow at times given her writing
style and her lack of appropriate punctuation.  Nevertheless, construing the
amended complaint liberally since Burton is proceeding *pro se*, and accepting her
factual allegations as true, as we must in connection with a motion to dismiss, we
construe the amended complaint as containing the following allegations.

Burton is a transgender woman.  She was initially incarcerated in a male
facility, but in early 2019, she was transferred to a female institution—SCI Muncy.

On February 16, 2019, Burton submitted a DC-135A (an Inmate Request to
Staff) to defendant Baez-Sprague complaining that defendant Brelsford sexually
harassed[2] her and retaliated against her.  In that form, Burton alleged that Brelsford

---

[1]  Although Burton lists in the caption that defendant Radziewicz is sued in his
official capacity, in the body of her amended complaint, she states that Radziewicz
is sued in both his official and individual capacities. *Compare doc. 53*-caption *with
doc. 53* ¶ 13.  And although Burton lists in the caption that defendant Santana is
sued in her individual and official capacities, in the body of her amended
complaint, she states the Santana is sued in her individual capacity. *Compare doc.
53*-caption *with doc. 53* ¶ 17.  Since Burton is proceeding *pro se*, we will resolve
these inconsistencies by construing the amended complaint in the broadest
reasonable manner.  Thus, we construe the amended complaint as naming
Radziewicz and Santana in both their individual and official capacities.

[2]  In its policy regarding PREA, the Department of Corrections defines "Sexual
Harassment" as including "[r]epeated verbal comments or gestures of a sexual
nature to an inmate, detainee, or resident by a staff member, contractor, or
volunteer, including demeaning references to gender, sexually suggestive or

was misusing gender pronouns when referring to her.  And she also alleged in that form that Brelsford said something to the effect the she does not know if Burton is a man or a woman.[3]  A few days after Burton submitted the DC-135A, defendant Baez-Sprague gave the from to a shift commander for an investigation, and on February 22, 2019, Burton was interviewed by a lieutenant.  Burton refused to write a statement and told the lieutenant to use the DC-135A as her written statement.

On February 23, 2019, defendant Brelsford was assigned to work on Burton's housing unit.  According to Burton, under Department of Corrections procedures, she should have been separated from Brelsford after she made a PREA-complaint against her, and the failure to separate her from Brelsford put her in danger of Brelsford retaliating against her, which is what Burton alleges, in fact, happened.

Under the pretext of a security inspection, defendant Brelsford searched Burton's cell in retaliation for her filing the DC-135A.  After the cell search,

---

derogatory comments about body or clothing, or obscene language or gestures." DC-ADM 008, Glossary of Terms-Sexual Harassment.

[3]  Burton's allegation in this regard is unclear.  After alleging that she informed Baez-Sprague of Brelsford's ongoing misuse of gender pronouns, Burton alleges: "Mr. Burton since she is unaware of her idenity she dont know if it's a man or woman, we were returning from am mealine." *Doc. 53* ¶ 22 (spelling and punctuation errors in original).

Brelsford issued Burton a misconduct report.[4]  Later that same day, Burton

informed defendant Baez-Sprague of Brelsford's alleged retaliation and that the

PREA-complaint process had failed.  Baez-Sprague told Burton that just because

she filed a report does not mean that she cannot be given a misconduct report.  On

February 27, 2019, defendant Santana, the hearing examiner at SCI Muncy,

sanctioned Burton with 20-days of cell restriction.

On March 25, 2019, defendant Brelsford, who was again assigned to work

on Burton's housing unit, stared at Burton and accused her of not wearing a bra.

According to Burton, she was wearing a sports bra, and Brelsford's accusation was

just a ploy to elicit a hostile reaction from her.  Attempting to comply with an order

from Brelsford to put on a bra, Burton went to put on a second bra.  Brelsford

followed her, and told Burton that every chance she gets, she is going to get her.

Brelsford continued to call Burton an "it," and she said that Burton was going to

pay for filing a lawsuit and PREA complaint against her.  Brelsford also told

Burton that she is going to the hole, that no one is going to help her, that she

should not have filed a lawsuit and PREA complaint, and that her reputation

precedes her.  Brelsford further told Burton that she was going to pay and every

---

[4]  Burton alleges that Brelsford was aware that she always makes food in her cell,
and from that allegation, it appears that the misconduct report had something to do
with Burton making food in her cell.  But the exact nature of the misconduct
charge is unclear from Burton's allegations.

time she gets a chance, she is going to write her up.  Brelsford then issued a false, retaliatory misconduct report regarding the bra incident.

Appearing before defendant Santana for a disciplinary hearing on the misconduct regarding the bra incident, Burton requested that Santana review video of the incident, which Burton says would have shown what she was wearing. Santana refused that request.  And although Burton asserted that the misconduct was retaliatory, Santana found Burton guilty and sanctioned her another 20-days of cell restriction.  As a result, Burton was unable to attend her transgender support programming, and she lost her job placement.

On April 8, 2019, defendant Brelsford was again assigned to work on Burton's housing unit.  She told Burton to remember what she had said: that every chance, I will get you.  Burton then asked to file a PREA retaliation complaint, and she was sent to the administration building and interviewed by a lieutenant.

The next day, April 9, 2019, defendant Sipe issued Burton a misconduct report charging her with lying to an employee in connection with her PREA retaliation complaint regarding Brelsford's ongoing and wide-spread "gender bullying" due to Burton being transgender. *Doc. 53* ¶ 52.  Sipe also told Burton that her reputation preceded her, that she is known to file lawsuits, and that Sipe judged her "upon others accord" and "to assist my peers." *Id*. ¶ 55.

Appearing again before defendant Santana for a disciplinary hearing, Burton asserted that the misconduct report issued by defendant Sipe was retaliatory, and she again requested video evidence to support her position.  Santana again denied Burton video evidence, stated that she believed defendant Sipe's version of the events over Burton's version, and sanctioned Burton with 30-days of cell restriction.  As a result, Burton lost her job and prison pay, she could not attend her transgender support group, and she has another Class One misconduct on her record that will count against her parole.

In August 2019, defendant Brelsford told Burton that she still has time and that she is going to get her.  Burton reported this threat to a sergeant, and she told the sergeant that she wanted to file a PREA retaliation complaint.  After being rebuffed by the sergeant, Burton called the PREA hotline and her mother.  She also spoke to a Jessie Alexander,[5] and explaining what happened, said she wanted to file a PREA retaliation report.  Alexander spoke to Brelsford, and Burton was then called to the administration building where she made a written report.

Burton also filed a grievance regarding staff not following PREA reporting procedures.  Defendant Baez-Sprague denied that grievance.  Commenting that video and witnesses confirm that the incident was unfounded, Baez-Sprague

---

[5]  It is not clear who Jessie Alexander is.  Burton alleges that "[w]hile pushing Jessie Alexander to church i explained what happened and stated i wanted to file a prea retaliation report he proceded to speak with Defendant Brelsford as i went to church." *Doc. 53* ¶ 64 (spelling, capitalization, and punctuation errors in original).

asserted that staff had followed proper procedures because Burton's complaint did not concern PREA retaliation.

Defendant Sipe then filed another misconduct report against Burton charging her with lying to an employee when she filed the report alleging PREA retaliation. According to Burton, defendant Baez-Sprague authorized the issuance of this misconduct report. Again, Burton appeared before defendant Santana, who denied Burton's request for video evidence and a witness. Santana found Burton guilty and sanctioned her with 30 days in the Restricted Housing Unit.

On appeal, the Program Review Committee modified the sanction to 20-days disciplinary custody but otherwise upheld Santana's decision. On further appeal to the facility manager, defendant Nicholas upheld the decision of the Program Review Committee and defendant Santana. On appeal to final review, the case was referred back to the institution for a rehearing.

Burton was then reissued a misconduct report that was materially the same as the prior misconduct report. Burton appeared again before defendant Santana, who at this second hearing allowed a witness and video evidence. Santana sanctioned Burton with time served.

In late 2019, defendant Sipe issued Burton yet another misconduct report again accusing Burton of lying—this time based on her report that Officer Giradi stood so close to her that his penis was in her face. According to Sipe, the video

confirmed that Officer Giradi was not in close enough proximity to Burton to support Burton's accusation.  At Burton's disciplinary hearing, defendant Santana denied Burton's request for a witness and she did not review the video of the incident.  Santana found Burton guilty and sanctioned her to 30 days in the Restricted Housing Unit.  Burton was released from the Restricted Housing Unit after 12 days, however, based on her appeal.  Nevertheless, because of the misconduct, she was unable to attend her transgender support group and she has another Class One misconduct on her record that will count against her parole.

In early December, less than a week after Burton was released from the Restricted Housing Unit, defendant Sipe issued her two more misconduct reports. The first concerned a PREA report submitted by Burton that alleged that Corrections Officer Shanon tried to humiliate her by stating "no one does this," which according to Burton was a reference to her "sexual indulgence," and then bending over and looking over his shoulder at Burton, which according to Burton was meant to mimic "a sexual position like doggy style" and was a reference to her sexual orientation and gender identity. *Id*. ¶¶ 89, 91.  Asserting that the video evidence contradicted Burton's account because at no time on the video can Officer Shanon be seen bending over, defendant Sipe charged Burton with lying about this incident.

At Burton's disciplinary hearing, defendant Santana stated that Officer Shanon was seen on the video slightly bending over and looking over his shoulder, but he was not looking at Burton's "point of reference." *Id*. ¶92. Santana found Burton guilty and sentenced her to 30 days in the Restricted Housing Unit. Burton then accused Santana of being malicious because she filed a lawsuit against her. Burton also confronted Santana, stating that she saw Officer Shannon do what Burton reported. Santana replied that she had a job to keep.

It is not clear from the amended complaint what the second misconduct report issued by defendant Sipe in early December 2019 concerned. But after Burton pleaded not guilty and made a statement, defendant Santana had Burton removed from the disciplinary hearing and sentenced her to 45 days in the Restricted Housing Unit consecutive to the 30 days given for the other misconduct, for a total of 75 days. After appealing, Burton served only a total of 12 days in the Restricted Housing Unit.

According to Burton, each time she was placed in the Restricted Housing Unit, she sent certified mail to defendant Radziewicz, who "was in total acquiescence to the wrong." *Id*. ¶ 97. Burton alleges that Radziewicz created PREA policies and procedures that were not employed. She also alleges that Radziewicz "set in place polices that were unconstitutional practice custom that created an unreasonable risk" and that Radziewicz "was aware that this

unreasonable risk existed by Ms. Burton['s] transgender status." *Id*. ¶ 98.
According to Burton, Radziewicz was indifferent to the risk "by citing the
unconstitutional practice custom and policy" and by failing to act once he was
made aware of 28 C.F.R. § 115.78(f).[6]  Burton alleges that Radziewicz failed to
properly train others and that the underlying violations of her rights resulted from
Radziewicz's "supervisory practice and procedure." *Id*. ¶ 102.

According to Burton, defendant Wetzel violated her Eighth Amendment
rights by creating policies that caused her injuries.  And defendant Nicholas
allegedly violated Burton's rights by failing to supervise and ensure adherence to
policies and procedures.  Burton also suggests that Nicholas acquiesced in the
wrongs done to her.  Burton further seeks to hold Nicholas liable based on
Nicholas' denial of her appeals regarding her disciplinary proceedings.

According to Burton, defendant Frantz approved the issuance of the
misconducts issued against her, and he had personal knowledge and failed to
remedy the matter.  In connection with Frantz, Burton also mentions a "custom

---

[6]  That regulation, which is part of the Department of Justice's PREA regulations,
provides: "For the purpose of disciplinary action, a report of sexual abuse made in
good faith based upon a reasonable belief that the alleged conduct occurred shall
not constitute falsely reporting an incident or lying, even if an investigation does
not establish evidence sufficient to substantiate the allegation." 28 C.F.R.
§ 115.78(f).

practice and policy of sanctioning inmates" for reporting perceived problems. *Id*. ¶ 114.

Burton presents three claims in her amended complaint. First, Burton claims that all the defendants violated the First Amendment by retaliating against her because she petitioned for redress of her grievances. Second, she claims that defendants Santana, Nicholas, Frantz, and Baez-Sprague violated her right to due process in connection with the disciplinary hearings and decisions against her. And third, she claims that the failure of defendants Wetzel, Nicholas, and Radziewicz to take disciplinary or other action "to curb the known pattern of antagonism, sexual harassment, and retaliation by defendants Sipe, Baez-Sprague, and Brelsford" violated her Eighth Amendment rights. *Id*. ¶ 119. Burton requests declaratory and injunctive relief as well as compensatory and punitive damages.

Currently pending is the defendants' partial motion to dismiss the amended complaint. *See doc. 70*. The motion is a partial motion to dismiss in that only defendants Wetzel, Radziewicz, Nicholas, Baez-Sprague, and Frantz seek dismissal of the claims against them.[7] That motion has been briefed. *See docs. 71, 84*. For the reasons discussed below, we will deny the defendants' motion. We will, however, sua sponte dismiss the claims against the defendants in their official

---

[7] Defendants Sipe, Brelsford, and Santana do not seek dismissal of the claims against them.

capacities, dismiss defendant Wetzel from this action, and dismiss Burton's Eighth

Amendment and due process claims.

### III.  Pleading and Motion-to-Dismiss Standards.

In accordance with Fed. R. Civ. P. 12(b)(6), the court may dismiss a

complaint for "failure to state a claim upon which relief can be granted."  When

reviewing a motion to dismiss under Rule 12(b)(6), "[w]e must accept all factual

allegations in the complaint as true, construe the complaint in the light favorable to

the plaintiff, and ultimately determine whether plaintiff may be entitled to relief

under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223,

229 (3d Cir. 2010).  In making that determination, we "consider only the

complaint, exhibits attached to the complaint, matters of public record, as well as

undisputedly authentic documents if the [plaintiff's] claims are based upon these

documents." *Id.* at 230.

"A Rule 12(b)(6) motion tests the sufficiency of the complaint against the

pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch.

Dist.*, 842 F. Supp. 2d 762, 769–70 (M.D. Pa. 2012).  "Under Federal Rule of Civil

Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the

claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S.

662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  The statement required by

Rule 8(a)(2) must give the defendant fair notice of the nature of the plaintiff's claim and of the grounds upon which the claim rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Detailed factual allegations are not required, but more is required than "labels," "conclusions," or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). "A complaint has to 'show' such an entitlement with its facts." *Id.*

In considering whether a complaint fails to state a claim upon which relief can be granted, the court "'must accept all facts alleged in the complaint as true and construe the complaint in the light most favorable to the nonmoving party.'" *Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 437 (3d Cir. 2018) (quoting *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015)). But a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997). A court also need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal,* a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir. 2010) (footnote and citations omitted) (quoting *Iqbal,* 556 U.S. at 675, 679).

A complaint filed by a *pro se* litigant is to be liberally construed and "'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson,* 551 U.S. at 94 (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)). Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

## IV.  Discussion.

Defendants Wetzel, Radziewicz, Nicholas, Baez-Sprague, and Frantz contend that the claims against them should be dismissed because the amended complaint fails to show that they were personally involved the alleged violations of Burton's rights.  Before we address the moving defendants' arguments, we sua sponte address whether Burton's claims against the defendants in their official capacities are barred by the Eleventh Amendment and whether Burton states Eighth Amendment and due process claims upon which relief can be granted.

### A.  Official Capacities Claims.

We begin by addressing whether Burton can maintain her claims against the defendants in their official capacities.  That issue involves the Eleventh Amendment, and the Eleventh Amendment implicates the court's subject-matter jurisdiction. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 318 (3d Cir. 2013) ("Therefore, unless Congress has 'specifically abrogated' the states' sovereign immunity or a state has unequivocally consented to suit in federal court, we lack jurisdiction to grant relief in such cases."); *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693, n.2 (3d Cir. 1996) (noting that "the Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction"); *but see Lombardo v. Pennsylvania,*

16

*Dep't of Pub. Welfare*, 540 F.3d 190, 197 (3d Cir. 2008) (noting that "the Supreme Court's jurisprudence has not been entirely consistent in the view that the Eleventh Amendment restricts subject matter jurisdiction").  Thus, '[t]he court may consider Eleventh Amendment issues *sua sponte*, but is not required to do so." *Zulueta v. Chuckas*, No. 1:18-CV-356, 2018 WL 5814689, at *2 (M.D. Pa. Nov. 6, 2018).  The Eleventh Amendment bars suits against a state in federal court. *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 83 (3d Cir. 2016).  A state, however, may waive its Eleventh Amendment immunity by consenting to suit, and Congress may abrogate states' Eleventh Amendment immunity when it unequivocally intends to do so and it acts pursuant to a valid grant of constitutional authority. *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999).  The Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity, *see* 42 P.C.S.A. § 8521(b), and 42 U.S.C. § 1983 does not override a state's Eleventh Amendment immunity. *Quern v. Jordan*, 440 U.S. 332 (1979).  And since official-capacity suits are "only another way of pleading an action against an entity of which an officer is an agent," *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978), claims against state officials in their official capacities for damages are treated as suits against the state and are barred by the Eleventh Amendment, *Christ the King Manor, Inc.*, 730 F.3d

at 318.  Thus, the Eleventh Amendment bars Burton's claims for damages under 42 U.S.C. § 1983 against the defendants in their official capacities.

The Eleventh Amendment does not bar claims against the defendants in their official capacities for prospective injunctive relief. *See Ex parte Young*, 209 U.S. 123 (1908).  But, here, since Burton is no longer incarcerated at SCI Muncy, her claims for injunctive relief are moot. *See Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) (stating that "[a]n inmate's transfer from the facility complained of generally moots the equitable and declaratory claims"); *Marshall v. Pa. Dep't of Corr.*, 499 F. App'x 131, 134 (3d Cir. 2012) (concluding that because Marshall "asked for an injunction that restrains SCI–Mahanoy officials from violating his civil rights, but he has now been transferred out from under their control[,] . . . the District Court was unable to fashion any form of meaningful relief against these defendants, and thus the motion for injunctive relief was moot").  Thus, we will dismiss those claims.

Because Burton has sued defendant Wetzel in his official capacity only, he will be dismissed from this action since the claims against him for monetary damages are barred by the Eleventh Amendment and the claims against him for injunctive relief are moot.

### B.  Eighth Amendment.

The court has the authority "on its own" to dismiss a claim brought by a prisoner with respect to prison conditions under federal law for failure to state a claim upon which relief can be granted. *See* 42 U.S.C. § 1997e(c)(1).  Pursuant to that authority, we will sua sponte dismiss Burton's Eighth Amendment claims.

"The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'" *Glossip v. Gross*, 576 U.S. 863, 876 (2015).  Conditions that inflict needless suffering, whether physical or mental, may constitute cruel and unusual punishment. *Tillery v. Owens*, 719 F. Supp. 1256, 1275 (W.D. Pa. 1989), *aff'd*, 907 F.2d 418 (3d Cir. 1990).  An Eighth Amendment claim gives rise to a two-prong analysis; such a claim has both an objective element and a subjective element. *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018) ("A properly stated Eighth Amendment claim must allege a subjective and objective element."). "To determine whether prison officials have violated the Eighth Amendment, we apply a two-prong test: (1) the deprivation must be 'objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities'; and (2) the prison official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'" *Porter v. Pennsylvania*

*Dept of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Burton complains that she was issued false, retaliatory misconduct reports. But "[a] false misconduct charge, standing alone, does not qualify as an Eighth Amendment violation." *Hagan v. Chambers*, No. 1:08-CV-1766, 2010 WL 4812973, at *15 (M.D. Pa. Nov. 19, 2010).  And Burton does not allege facts from which it can reasonably be inferred that she was deprived of the minimal civilized measure of life's necessities.  Thus, she does not satisfy the objective prong of an Eighth Amendment claim.[8]  Accordingly, we will dismiss Burton's Eighth Amendment claims.

Further, although not pleaded as a separate claim, to the extent Burton is seeking to present an Eighth Amendment claim based on defendant Brelsford's alleged failure to use the proper pronouns when referring to Burton, Brelsford calling Burton "it," Brelsford threatening Burton, or other such verbal harassment by Brelsford or others, the amended complaint fails to state a claim upon which

---

[8]  Burton refers to her time in the Restricted Housing Unit as solitary confinement. Although prolonged solitary confinement can raise constitutional issues, *see Porter*. 974 F.3d at 442 (discussing the severe effects of prolonged solitary confinement), according to Burton's allegations, she was in the Restricted Housing Unit for only short periods of time: once for 20 days and twice for 12 days at a time.  Thus, Burton's amended complaint does not raise the type of issues that arise in cases of prolonged solitary confinement.  Moreover, Burton does not allege anything about the actual conditions in the Restricted Housing Unit.

relief can be granted because such verbal harassment simply does not rise to the level of a constitutional violation. *See Sears v. McCoy*, No. 19-2673, 2020 WL 3830921, at *2 (3d Cir. July 8, 2020) ("A prisoner's allegations of verbal harassment, unaccompanied by another injury, are not cognizable under § 1983."); *Gandy v. Reeder*, 778 F. App'x 149, 151 (3d Cir. 2019) ("We agree with those courts that have held that mere insults, without more, cannot constitute . . . an Eighth Amendment violation.");*Washington v. Rozich*, 734 F. App'x 798, 801 (3d Cir. 2018) ("Verbal harassment of a prisoner, although distasteful, does not violate the Eighth Amendment."); *Manon v. Garrison*, No. 1:CV-12-0844, 2012 WL 3542328, at *2 (M.D. Pa. Aug. 15, 2012) (observing that allegations regarding sexual comments and gestures do not state a constitutional violation).

### C. Due Process.

Burton claims that the defendants denied her due process in connection with her disciplinary proceedings.  The amended complaint fails, however, to state a due process claim upon which relief may be granted because Burton has not alleged facts from which it can reasonably be inferred that she had a liberty interest protected under the Due Process Clause.  Thus, we will sua sponte dismiss the due process claims.

The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend.

XIV.  A due process claim requires a two-part analysis.  First, the court must determine whether the interest asserted by the plaintiff is within the scope of protection of life, liberty, or property found in the Due Process Clause. *Shoats v. Horn,* 213 F.3d 140, 143 (3d Cir. 2000).  Second, if the interest is one that is protected by the Due Process Clause, "the question then becomes what process is due to protect it." *Id.*

In *Sandin v. Conner,* 515 U.S. 472 (1995), addressing the question of when the state can create liberty interests protected by the Due Process Clause, the United States Supreme Court held that:

> States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* at 483–84.

In *Sandin,* the inmate was sentenced to thirty days of disciplinary confinement in the Special Holding Unit.  As a result of the prisoner's disciplinary segregation he "had to spend his entire time alone in his cell (with the exception of 50 minutes each day on average for brief exercise and shower periods, during which he nonetheless remained isolated from other inmates and was constrained by leg irons and waist chains)." *Id.* at 494 (Breyer, J. dissenting).  The Court

22

concluded that the inmate's thirty days in the Special Holding Unit, considered within the context of prison confinement, did not impose the type of atypical and significant deprivation of liberty in which the state could be seen to have created a liberty interest. *Id.* at 486.  The Court noted that disciplinary confinement at the prison in question, with only insignificant exceptions, mirrored conditions imposed on inmates in administrative and protective custody; that based on a comparison of inmates inside of and outside of disciplinary segregation, placement in segregation for thirty days did not work a major disruption in the inmate's environment; that disciplinary action did not inevitably affect the duration of the inmate's sentence; and that the "regime to which [the inmate] was subjected was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* at 486–87.

"After *Sandin,* it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin,* 545 U.S. 209, 223 (2005) (quoting *Sandin, supra,* 515 U.S. at 484).  In deciding whether a protected liberty interest exists under *Sandin,* we consider the duration of the confinement and the conditions of that confinement in relation to other prison conditions. *Mitchell v. Horn,* 318 F.3d

523, 532 (3d Cir. 2003).  Whether a protected liberty interest exists under *Sandin*

requires inquiry into the specific facts of the case. *Id.* at 533.  But "inmates are

generally not entitled to procedural due process in prison disciplinary hearings

because the sanctions resulting from those hearings do not usually affect a

protected liberty interest." *Burns v. Pennsylvania Dept. of Corrections,* 642 F.3d

163, 171 (3d Cir. 2011).

Burton has not alleged facts from which it can reasonably be inferred that

she was subjected to atypical and significant hardships in relation to the ordinary

incidents of prison life such that she had a liberty interest protected by the Due

Process Clause.  While she alleges that she was sanctioned with time in the

Restricted Housing Unit, she alleges that she spent only short stints—20 days on

one occasion and 12 days on two different occasions—in the Restricted Housing

Unit.  That amount of time in disciplinary custody by itself does not amount to an

atypical and significant hardship. *See Smith v. Mensinger,* 293 F.3d 641, 654 (3d

Cir.2002) (holding that seven months of disciplinary confinement not an atypical

and significant hardship).  And Burton does not allege anything regarding the

conditions in the Restricted Housing Unit.

Further, Burton has not alleged that the disciplinary findings inevitably

affected the length of her criminal sentence, such as by the revocation of good time

credits.  While Burton does suggest that the disciplinary findings may affect her

parole date, in Pennsylvania, a prisoner does not have a liberty interest in being released on parole. *See Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,* 442 U.S. 1, 7 (1979) (the Constitution creates no liberty interest in parole); *Rogers v. Pennsylvania Bd. of Probation and Parole,* 724 A.2d 319, 323 (Pa. 1999) (under Pennsylvania law, parole is a matter of grace and mercy shown to a prisoner and the Board's decision to grant or deny parole does not affect a liberty interest).

Also, the Supreme Court has rejected the contention that a prisoner has a liberty interest with respect to misconduct proceedings merely because the misconduct may be taken into consideration in the parole process:

> Nor does Conner's situation present a case where the State's action will inevitably affect the duration of his sentence. Nothing in Hawaii's code requires the parole board to deny parole in the face of a misconduct record or to grant parole in its absence, Haw.Rev.Stat. §§ 353–68, 353–69 (1985), even though misconduct is by regulation a relevant consideration, Haw.Admin.Rule § 23–700–33(b) (effective Aug. 1992). The decision to release a prisoner rests on a myriad of considerations. And, the prisoner is afforded procedural protection at his parole hearing in order to explain the circumstances behind his misconduct record. Haw.Admin.Rule §§ 23–700–31(a), 23–700–35(c), 23–700–36 (1983). The chance that a finding of misconduct will alter the balance is simply too attenuated to invoke the procedural guarantees of the Due Process Clause. The Court rejected a similar claim in *Meachum,* 427 U.S., at 229, n. 8, 96 S.Ct., at 2540 (declining to afford relief on the basis that petitioner's transfer record might affect his future confinement and possibility of parole).

*Sandin,* 515 U.S.at 487 (1995).

25

In sum, Burton has not alleged facts from which it can reasonably be inferred that she was subjected to atypical and significant hardships in relation to the ordinary incidents of prison life as a result of the findings of guilt on the misconduct charges such that she had a liberty interest protected by the Due Process Clause.  Accordingly, the amended complaint fails to state a due process claim upon which relief may be granted, and we will dismiss the due process claims.

### D.  Personal Involvement.

We now turn to the contention of defendants Radziewicz, Nicholas, Baez-Sprague, and Frantz[9] that the court should dismiss the claims against them because Burton has not sufficiently alleged that they were personally involved with the alleged violation of her rights, which given the discussion above is limited to her claim of retaliation for filing complaints.

Liability in a 42 U.S.C. § 1983 action is personal in nature, and to be liable, a defendant must have been personally involved in the wrongful conduct.  Thus, respondeat superior cannot form the basis of liability. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018).  In other words, "each Government

---

[9]  Although defendant Wetzel is also a moving defendant, as set forth above, we will dismiss the claims against him on other grounds.  Thus, we need not consider whether the amended complaint sufficiently alleges personal involvement on the part of Wetzel.

official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  And so, a constitutional deprivation cannot be premised merely on the fact that the defendant was a supervisor when the incidents set forth in the complaint occurred. *See Alexander v. Forr*, 297 F. App'x 102, 104–05 (3d Cir. 2008).  Rather, "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Third Circuit has "recognized that 'there are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations.'" *Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010)).

The moving defendants suggest that to the extent that Burton is seeking to hold them liable based on their creation of policies that allegedly violated her rights, such can never be a viable basis for liability.  The defendants are incorrect. *See Parkell*, 833 F.3d 330 ("there are two theories of supervisory liability, one

27

under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm . . . ."); *Palakovic v. Wetzel*, 854 F.3d 209, 234 (3d Cir. 2017) (holding that the plaintiffs stated failure-to-train claims against the supervisory defendants). Apart from incorrectly suggesting that a supervisory defendant may never be liable based on a policy the defendants do not address whether the actual allegations in the amended complaint are sufficient to support supervisory liability based on a policy, practice, custom. Thus, the defendants have not shown that they are entitled to dismissal on this basis.

Moreover, the amended complaint can also reasonably be construed as alleging that defendants Radziewicz, Nicholas, Baez-Sprague, and Frantz were personally involved under the knowledge-and-acquiescence strand of supervisory liability.

"Where a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in (i.e., tacitly assented to or accepted) the subordinate's conduct." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997) (footnote omitted), *abrogated on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). "A plaintiff makes sufficient allegations of a defendant's personal involvement by

28

describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).

Burton alleges that after she filed PREA complaints, she was issued misconduct reports in retaliation. She alleges an ongoing pattern of retaliation.

As to defendant Radziewicz, Burton alleges that each time she was placed in the Restricted Housing Unit, she sent certified mail to Radziewicz, who "was in total acquiescence to the wrong." *Doc. 53* ¶ 97. And she attached to her amended complaint as an exhibit a letter dated January 27, 2020, from Radziewicz to her responding to her December 19, 2019 correspondence to him. *See doc. 54* at 29. In that letter, Radziewicz states, in pertinent part:

> Within your correspondence, you opine that the facility is violating your rights and retaliating by issuing misconducts when allegations you make are determined to be unfounded.

> As conveyed to you in previous correspondence and consistent with PREA standard §115.78(f), when an allegation is disproven and determined not to have been made in good faith; discipline may be issued.

*Id.* Given Burton's allegations and the exhibit that she attached to her amended complaint, we cannot say as a matter of law that defendant Radziewicz was not personally involved in the alleged, ongoing pattern of purportedly retaliatory misconduct reports that Burton received after she filed PREA complaints.

As to defendant Nicholas, Burton alleges that she filed appeals of her disciplinary charges to Nicholas, who denied her appeals.  And she attached to her amended complaint as exhibits some of her appeals in which she complains of, among other things, a policy, custom, and practice of issuing her retaliatory misconduct reports after she reports sexual harassment and requesting that such retaliation stop. *See doc. 54* at 55, 109, 119, 131.  She also submitted Nicholas's response to one such appeal. *Id*. at 105.

Defendant Nicholas contends that her only alleged involvement is her response to Burton's grievances and complaints and that such is not sufficient to show personal involvement.  It is true that "[t]he 'after-the-fact' review of a grievance, or an inmate's dissatisfaction with a grievance response, do not establish the involvement of officials and administrators in any underlying constitutional deprivation." *Stuart v. Murray*, No. 1:18-CV-0430, 2020 WL 6710209, at *6 (M.D. Pa. Nov. 16, 2020); *see also Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) ("Although the complaint alleges that Appellees responded inappropriately to Brooks's later-filed grievances about his medical treatment, these allegations do not establish Appellees' involvement in the treatment itself."). But in some circumstances, a grievance or appeal may be enough to put an official on notice of an alleged continuing violation of a prisoner's rights, and, therefore, may show actual knowledge of an alleged constitutional violation and

acquiescence in the events forming the basis of a prisoner's claims. *See Johnson v. Wireman*, 809 F. App'x 97, 100, 100 n.20 (3d Cir. 2020) (refusing to dismiss two defendants for lack of personal involvement in claims that the prisoner's religious rights were being violated based, in part, on their responses to his grievances; noting that the prisoner did not merely allege that the defendants "denied the grievances, which would amount to an impermissible *respondeat superior* theory of liability"; and suggesting that the grievances and responses were enough to sufficiently allege actual knowledge and acquiescence); *Parkell*, 833 F.3d at 337 n.14 ("Our oft-cited holding in *Rode v. Dellarciprete,* 845 F.2d 1195, 1208 (3d Cir. 1988) that the mere <u>filing</u> of a grievance does not show actual knowledge by a supervisor is not applicable, as Phelps's letters show that he actually had reviewed the grievances."); *Diaz v. Palakovich,* 448 F. App'x 211, 215 (3d Cir. 2011) (holding that summary judgment for the defendants was improper where the defendants had knowledge through the grievance process of an alleged ongoing practice of improper handling of the plaintiff's mail and the defendants failed to take corrective action); *Sutton v. Rasheed*, 323 F.3d 236, 249–50 (3d Cir. 2003) (concluding that summary judgment was not warranted as to a defendant who received from the prisoner a letter, styled as a final appeal of a grievance, who referred the issue to another, and who then responded by denying the grievance appeal); *Atkinson v. Taylor,* 316 F.3d 257, 270-271 (3d Cir. 2003) (refusing to hold

as a matter of law that correspondence or conversations with prison officials do not constitute sufficient evidence of actual knowledge and acquiescence).

Here, Burton alleges an ongoing pattern of retaliation, and she alleges that although she informed Nicholas of such, Nicholas did nothing to stop the retaliation. As with defendant Radziewicz, given Burton's allegations and the exhibits that she attached to her amended complaint, we cannot say as a matter of law that defendant Nicholas was not personally involved in the alleged, ongoing pattern of purportedly retaliatory misconduct reports that Burton received after she filed PREA complaints.

As to defendant Baez-Sprague, Burton also alleges that she informed him of the purported retaliation and that he did nothing to stop it. *See doc. 53* ¶¶, 31, 32, 67, 69–73, 86. And she alleges that as the PREA compliance manager at SCI Muncy, Baez-Sprague reviewed incident reports and authorized the issuance of the misconduct reports against her. *Id*. at ¶ 8, 72, 73. Burton also attached as exhibits to her amended complaint numerous PREA investigative reports regarding Burton's complaints that appear to be signed by Baez-Sprague as well as a document regarding one of Burton's misconducts that Baez-Sprague signed as a member of the Program Review Committee. *See doc. 54* at 31, 33, 35, 37, 39, 41, 113. As with defendants Radziewicz and Nicholas, given Burton's allegations and the exhibits that she attached to her amended complaint, we cannot say as a matter

of law that defendant Baez-Sprague was not personally involved in the alleged, ongoing pattern of purportedly retaliatory misconduct reports that Burton received after she filed PREA complaints.

Finally, as to defendant Frantz, Burton alleges that pursuant to Department of Corrections policy, defendant Frantz as the deputy for facilities management at SCI Muncy would be on an administrative board regarding PREA, that he reviews PREA incident reports, that he approved the misconduct reports issued to her, and that he had knowledge of the alleged retaliation and failed to remedy the situation. *See doc. 53* ¶¶ 112, 113, 115, 116.  And Burton also attached as an exhibit to her amended complaint a document regarding one of Burton's misconducts that Frantz signed as a member of the Program Review Committee. *Doc. 54* at 113.  As with the other defendants, given Burton's allegations and the exhibit that she attached to her amended complaint, we cannot say as a matter of law that defendant Frantz was not personally involved in the alleged, ongoing pattern of purportedly retaliatory misconduct reports that Burton received after she filed PREA complaints.

In sum, Burton has sufficiently alleged the personal involvement of defendants Radziewicz, Nicholas, Baez-Sprague, and Frantz.  Accordingly, we will deny the motion to dismiss.

**V.  Conclusion.**

Based on the foregoing, we will deny the partial motion (*doc. 70*) to dismiss Burton's amended complaint.  We will, however, sua sponte dismiss the claims against the defendants in their official capacities, dismiss defendant Wetzel from this action, and dismiss Burton's Eighth Amendment and due process claims.  An appropriate order will issue.

<u>*S/Susan E. Schwab*</u>
Susan E. Schwab
United States Magistrate Judge